IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| **DEBORAH M. POINDEXTER, ET AL** | * | **CIVIL ACTION NO. 04-1035** |
| **VERSUS** | * | **JUDGE JAMES** |
| **UNITED STATES OF AMERICA, ET AL** | * | **MAGISTRATE JUDGE HAYES** |

## RULING ON MOTIONS IN LIMINE[1]

Before the undersigned Magistrate Judge, on reference from the District Court, are defendants' Motion In Limine To Exclude Subsequent Opinions of Dr. Leighton Sissom As An Expert (Document No. 43), Motion In Limine To Exclude Or Limit Dr. Leighton Sissom As An Expert (Document No. 45), and Motion in Limine To Exclude Or Limit Dr. Max Spindler As An Expert (Document No. 44). For the reasons stated below, the defendants' Motion in Limine To Exclude Subsequent Opinions of Dr. Leighton Sissom on the basis of untimeliness is **DENIED**. The defendants' Motion in Limine to Exclude Or Limit Dr. Max Spindler As An Expert and Motion in Limine To Exclude Or Limit Dr. Leighton Sissom As An Expert are **GRANTED in Part and DENIED in Part.**

### I. BACKGROUND

This wrongful death and survival action filed by plaintiffs, Marshall Wayne Poindexter ("Marshall"), Brandon Wayne Poindexter ("Brandon"), and Deborah M. Poindexter ("Deborah"),

---

[1] As this is not one of the motions excepted in 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this ruling is issued under the authority thereof, and in accordance with the standing order of this court. Any appeal must be made to the district judge in accordance with Rule 72(a) and L.R. 74.1(W).

the adult sons and surviving spouse of Thomas Wayne Poindexter ("Thomas"), arises out of a tragic accident which led to his death by drowning. At approximately 1 a.m. on May 11, 2003, Thomas and his brother-in-law, Oliver A. Douglas ("Oliver"), were jug fishing in Big Creek, located in Richland Parish. When one of their jugs went too close to a section of the creek containing a weir[2] constructed by the U. S. Army Corps of Engineers, they approached the weir in order to retrieve it.

The weir consists of a wall of corrugated steel that runs from one bank to the other and down into the creek bed. On the upstream side of this corrugated wall is a layer of riprap, a large collection of rocks adjacent to the weir that adds structural support and reduces erosion. For added structural support, on the downstream side of the corrugated wall is a horizontal steel brace, known as a wale, that runs the length of the weir and is located approximately thirteen inches below the top edge of the weir. Looking at the weir from above, this wale, which is flush against the weir's corrugated main wall, creates multiple openings as it runs the length of weir.

As they approached the weir, Thomas and Oliver's boat struck some rocks, stranding the boat and causing its motor to stall. In an effort to extricate the boat and restart the motor, Thomas and Oliver got out of the boat and attempted to push it off of the rocks. Thomas, while either walking along the weir or standing on the rocks, slipped and/or lost his balance and fell. His right leg slipped into one of the openings between the weir and the wale, fracturing his leg and trapping him under water, causing him to drown.

This action against the defendants, Board of Commissioners of the Tensas Basin Levee District ("Levee District") and the United States of America, on behalf of U.S. Army Corps of

---

[2] A weir is defined as "a dam in a stream to raise the water or level or divert its flow." *The Merriam-Webster Dictionary* 834 (1994).

Engineers ("Government") followed.[3] Plaintiffs allege that Thomas's death was a consequence of the defendants' failure, as owners and/or custodians of the weir on which Thomas became entangled, either (1) to take measures to prevent boaters from entering upon the weir and becoming injured or (2) to post warnings and signs cautioning boaters of the foreseeable hazards that the weir posed.

In support of their claims, plaintiffs offer two experts, Dr. Max Spindler ("Spindler"), a civil engineer specializing in water resources and fluid mechanics, and Dr. Leighton Sissom ("Sissom"), a mechanical engineer. Defendants attack the admissibility of both experts' testimony on the grounds of relevance and on the grounds that the testimony does not pass the threshold for admissibility required under Federal Rule of Evidence 702 and the factors set out in the case of *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), and its progeny.

Defendants also seek to exclude Sissom's supplemental report and opinions on the basis of timeliness. That Motion will be addressed first.

**Motion in Limine to Exclude Subsequent Opinions of Dr. Leighton Sissom as an Expert**

The defendants seek to exclude as untimely, according to this Court's December 23, 2004, Scheduling Order, the supplemental opinion of Sissom that the most appropriate warning language would have been "DANGER, Underwater Obstruction 500 Feet, Hazardous Undertow - Turbulent Water, Keep Off Weir and Riprap, Failure to Observe May Cause Entrapment/Drowning." The Scheduling Order set May 3, 2005, as the plaintiffs' deadline for submitting expert reports to the defendants pursuant to Fed. R. Civ. Proc. Rule 26(a)(2) and July

---

[3] Plaintiffs originally filed suit against the Levee District in the Fifth District Court for the Parish of Richland and against the Government in this Court. The Levee District filed a Third Party Demand against the Government in the state court case, and the Government removed the state court action to this Court. The actions were then consolidated.

27, 2005, as the deadline for completion of all expert depositions. During Sissom's deposition held on Monday, July 25, 2005, he failed to give an example of what an appropriate warning sign should have stated; however, he did discuss at length the four elements of a proper warning, which included the action to be taken to avoid danger and the consequences of not heeding the warning. At the deposition of Spindler the following Monday, August 1, 2005, plaintiffs' counsel informed defendants' counsel that Sissom was going to supplement his Rule 26 report to include what he considered to be an appropriate warning. On August 26, 2005, the defendants, via facsimile, received Sissom's supplemental opinion that included the warning language cited above.

> The portion of the Scheduling Order dealing with expert reports provides:
>
> Reports to be disclosed in compliance with Fed. R. Civ. Proc. 26(a)(2)(B), except for the listing of any other cases in which the expert has testified as an expert at trial or by deposition within the preceding four years, shall be delivered to opposing party. If there is any subsequent change in the expert's opinion or its basis, the offering attorney must notify all counsel within 5 business days.

As indicated above, notice of Sissom's supplemental opinion regarding appropriate warning language was provided to defendants' counsel within 5 business days of his deposition and, therefore, is timely according to the Scheduling Order. Furthermore, the defendants have failed to demonstrate any prejudice which would result from permitting Sissom to amend his report to include specific warning language. As this Court has upset and not yet rescheduled both the pre-trial conference and trial dates, the defendants are free to re-depose Sissom about his supplemental opinions, and their experts have ample time to review the opinions and to challenge them, if necessary. The Court also notes that Sissom's supplemental opinion corresponds exactly to the four elements of warnings that he described during his deposition and therefore lacks any unfair surprise. In sum, the Court finds no reason to exclude Sissom's supplemental opinions

regarding appropriate warning language, and the defendants' Motion in Limine to exclude the supplemental report of Dr. Sissom on the basis of timeliness is **DENIED**.

A. <u>**Legal Standard**</u>

Under Federal Rule of Evidence 702, a district court has considerable discretion in deciding whether to admit or exclude expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-9 (1997) (reviewing district court's determination under abuse of discretion standard). Reliability and relevance, under Rule 702, are the hallmarks of admissible testimony from an expert witness "qualified . . . by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993). Relevance includes not only the general requirement contained in Rule 401 that the testimony tend to make the existence of any fact more probable or less probable, but also the prerequisite that the expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (quoting 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[02], p. 702-18 (1988)). Reliability, according to Rule 702, requires that (1) the testimony be based upon sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court's landmark case on the

admissibility of expert testimony, the Court identified several factors relevant to assessing whether an expert's methodology is scientifically valid and reliable. 509 U.S. at 592-595. While non-exhaustive, these factors include:

> (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). The Court also cautioned that, rather than focusing on an expert's particular conclusions, Rule 702 and the factors included under the umbrella of reliability should instead be limited to analyzing the scientific principles and methodologies used in arriving at those conclusions. 509 U.S. at 595. As with other preliminary evidentiary questions, a party seeking to admit expert testimony must establish relevance and reliability "by a preponderance of proof." *Id.* at 593 n.10.

### A. Dr. Spindler's Testimony

Although Spindler expressed opinions on other issues in this case, plaintiffs, in their opposition to the motion in limine, have confirmed that they intend to limit his testimony to include only his opinion that certain modifications to the weir would not have adversely affected the weir's hydrodynamic function. Spindler has a Ph.D. in civil engineering with a specialty in hydraulics and fluid mechanics, and he is an Associate Professor of Civil Engineering at the University of Texas in Arlington, Texas. Based on his engineering qualifications and specialized knowledge of hydraulic and fluid mechanics, plaintiffs proffered Spindler for an assessment of what measures, in his opinion, the defendants could have taken to eliminate the openings in the weir that caused Thomas to become entrapped. Spindler, throughout his testimony, conceded

6

that his experience in designing and constructing weirs was limited to laboratory experiments involving weirs of much smaller scale and different design. However, he based his conclusion that placing a steel cap over the length of the weir would not interfere with its hydrodynamic function on an application of relevant principles of fluid mechanics and his personal experience as a water resources engineer.

Spindler explained that the weir, one out of a series of weirs located on Big Creek, functions similarly to a dam in that it holds back water upstream and therefore aids in reducing the vegetation on the banks of Big Creek by raising the overall water level. Unlike a dam, however, the weir is designed only to raise the water up to a designated level, and not to contain it completely. If flood waters elevate the water level beyond the height of the weir, then the water simply spills over and flows into other parts of Big Creek. Spindler opined that welding a steel cap across the top of the wale, thereby eliminating the openings that the support bar or wale created, would not impede water flow over the weir in the event that Big Creek's water level rose above the height of the weir.

Spindler was unable to say whether the weir contained a design defect as originally built, but conceded that the weir was the same at the time of the accident as when it was first constructed and that the openings in the corrugated wall were not due to some post-construction modification.

The undersigned finds that Spindler's opinion is based upon sound engineering principles and that it is reliable insofar as it goes. However, the relevance of Spindler's limited testimony is contingent on the admissibility of evidence that an alternative design was otherwise needed and or feasible. Therefore, the ultimate admissibility of his testimony is contingent on the admissibility of the opinions of the other witness whose opinions are the subject of motions in

7

limine, Dr. Sissom.

## B. Dr. Sissom's Testimony

In his Rule 26(a)(2)(B) report, Sissom expressed the following twelve factors which he claims are not in dispute and which form the background for his opinions on the weir and the safety measures that the defendants could have implemented:

    1. This dam/weir is a development project, leaving Big Creek no longer in its natural state of the great outdoors. A boat ramp is provided for launching boats, and the stream is commonly used for fishing and swimming.

    2. It was foreseeable that boats would approach the weir.

    3. It should be anticipated that boaters would disembark on the riprap atop the weir in emergencies.

    4. The ends of the dam were not guarded by a barricade. It is known that sportsmen had ridden across the dam on 4-wheelers, perhaps even pickups.

    5. The brace was an entrapment danger, more dangerous located near the top.

    6. There was no guard, such as a cable stretched across Big Creek, to stop boaters from getting about the weir and its dangers.

    7. There were no warnings - signs, buoys, etc. - upstream of the weir to caution boaters about the weir and its dangers. A cable is reportedly stretched across the Creek at another dam/weir location with a faded/rusted sign on it, which purportedly warned about the danger at that location.

    8. At least one sign should have been located at the upstream side of the dam near the midstream, warning of the riprap and dam. Such a sign could have been mounted on a reinforced concrete post.

    9. There were no warning signs on the stream banks upstream of the weir warning of any

dangers. According to the US Corps of Engineers, at the time of construction, signs were placed on the stream banks which read: "Danger - Underwater Obstruction 500 ft. - Hazardous Undertow - Turbulent Water." No such signs existed in the recent past according to local residents and sportsmen. On February 24, 1993, the Corps of Engineers gave their signs to the Tensas Basin Levee Board and discontinued their maintenance of them. They recommended that the Levee Board "could best reduce your liabilities by posting proper signs at each weir to warn of the possible hazard."

10. The weir was not maintained in a safe manner.

11. Periodic inspections were not made on the weir.

12. A solid cap or plate across the corrugated weir openings would have prevented the entrapment.

Sissom also listed the information he used in forming his opinions, which included the accident and coroner's reports; photographs and measurements of the weir; statements of Oliver, the only eyewitness to the accident; defendants' responses to interrogatories; safety publications from the American National Standards Institute (ANSI), Occupational Safety and Health Administration (OSHA), and other safety experts; and documents from the Army Corps of Engineers.

Both in his report and deposition, Sissom described his area of expertise as "statics and dynamics of electro-mechanical systems, including structures; cause and origin of fires; fluid mechanics; machine design; ergonomics; and human factors." During deposition, however, Sissom conceded that his expertise in cause and origin of fires and machine design did not bear on his opinions or testimony in this case. Sissom possesses various degrees, including a Ph.D. in mechanical engineering, and he maintains positions as owner of a consulting firm, Sissom & Associates, Inc., and as Dean Emeritus of Engineering at Tennessee Technological University. Sissom has served as a consultant to over 700 clients and has testified in court as an expert

9

witness over 200 times. Although Sissom's experience includes cases involving boating accidents, he admitted that he had never examined a weir or dam outside of academic exercises and had never given testimony in a drowning case in which the apparent cause was a weir, dam, or similar entrapment.

Sissom also admitted that while there were some loose bolts and rust when he inspected the weir, those conditions did not contribute to the accident in this case.

At a *Daubert* hearing held on November 9, 2005, Sissom, and even plaintiffs' counsel, elaborated on his opinions, qualifications, and methodologies. After reviewing several of the above assumptions of fact that Sissom used as the bases for his opinions[4], including the absence of any safety inspections and the defendants' knowledge that the weir created turbulent water flow and a hazardous undertow, plaintiffs' counsel, in response to an objection, outlined the scope of Sissom's opinions. Specifically, citing the defendants' awareness that the weir created dangerous water conditions, and translating this awareness into an awareness of the risk of entrapment created by the openings in the weir, plaintiffs' counsel described Sissom's testimony as relating to one sole issue: "After a recognition it [the weir] is a dangerous situation, how do you remediate it by either structural modifications or signage?"

Thus, Dr. Sissom's opinion is based on an assumption of fact that the defendants

---

[4] One particular assumption of fact that Sissom apparently made was that the defendants were aware that individuals had driven all-terrain vehicles across the weir in the past. A review of the record fails to provide a factual basis to support this claim. In fact, Sissom admitted at the hearing that Sissom learned this "fact" from Mr. Stephens, one of the plaintiffs' attorneys, who allegedly heard it from other people, none of whom were named or otherwise identified. Obviously such hearsay evidence would not be admissible at trial and, even if it were admissible would be insufficient to form the basis for a reliable opinion. The evidence is insufficient to support a claim that the travel had even occurred, much less that the defendants were aware of same.

recognized the danger of entrapment presented by the weir structure.

Sissom first opined that the defendants should have eliminated the openings in the weir by either retrofitting them with steel caps or plugging the openings with concrete, stating that either option would have eliminated the openings in the weir and would not have interfered with its hydrodynamic function. Sissom acknowledged the obviousness of this solution, but insisted that only an engineering expert could accurately gauge "what size structural members are required, how they ought to be fastened, bolted, welded, or whatever, and the kind of material that ought to be used." Sissom conceded that he had not tested any of his suggested modifications or performed any mock-ups, and that he had not actually seen his recommendation used in the field. Instead, his conclusion that the defendants should have retrofitted the weir with steel caps resulted from an application of general engineering principles and personal experiences. Sissom stated that his opinions conformed with methodologies generally accepted in the field of mechanical engineering, utilized principles that had been subjected to peer review, and contained absolutely no discernible rate of error. In addition to determining the specific type of steel and installation method that would have to be used in capping the weir, Sissom also claimed to have performed an economic analysis of implementing the modification for feasibility purposes. After reviewing the amount of steel needed to cover the weir, obtaining price quotations via the Internet, and factoring in his personal experience with welding, he concluded capping the weir would be "fairly simple and quite inexpensive" and would cost roughly $3,327.00. On cross-examination, however, Sissom admitted that he had performed this analysis only for the weir in which Thomas became entrapped, and had not considered how much it would cost to modify every weir that the Government had ever erected, the maintenance costs of having to replace the caps once they became rusted and weak, or that steel caps had never been

tested or utilized in the field. With respect to this last consideration, Sissom countered that instead of steel caps the Government had utilized concrete plugs on a few weirs in the past and that they did not interfere with the weirs' hydraulic functions. However, he admitted that the concrete plugs had been used for structural reasons, rather than for safety ones, and had no evidence to refute the government's claim that the practice had been discontinued due to increased and unsustainable maintenance costs.

Neither Sissom nor the plaintiffs have pointed to any industry standard requiring steel covers of the sort suggested, any similar accident on a weir that would have been prevented by using a steel cover, or the use of a steel or similar cover in the field. Sissom admitted as much when he conceded that, as far as he knew, weir construction, today, has remained virtually unchanged since the 1960s and does not involve the use of covers on the wales.

The undersigned finds that Sissom's opinions regarding alternative design of the weir is not based on sufficient facts and that it has not been sufficiently tested to be reliable on the issue of feasibility, and **GRANTS** the defendants' motion in limine on this issue.

Because Dr. Sissom's opinion regarding alternative design of the weir is not sufficiently reliable to be admissible, Dr. Max Spindler's opinion regarding the effect of capping the wale on the hydraulic function of the weir is irrelevant. Therefore, the motion in limine as to Dr. Spindler's testimony is **GRANTED** as well.

Sissom also gave several opinions regarding the type of warnings that the defendants should have posted. While it is undisputed that the warning signs which were originally posted had not been maintained, and that they would not have been visible during hours of darkness even if they had been maintained, Dr. Sissom

12

expressed the opinion that the original warnings, even if maintained in their original condition, were inadequate.  Again, his opinion on the need for different and additional warnings presupposes notice of the entrapment danger created by the wale.  He opined that the original signs, which read, "DANGER, Underwater Obstruction 500 Feet, Hazardous Undertow, Turbulent Water," did not sufficiently warn people about the danger of falling into one of the weir's openings and becoming entrapped.

Based on his education, training, and experience, Sissom stated that a proper warning should have four descriptive components: (1) the words "danger" or "warning"; (2) the nature of the hazard; (3) the action to be taken to avoid injury or damage; and (4) the consequences that might result if the indicated action is not taken.  Following this model, Sissom proposed a warning using luminescent paint which would be visible after dark that stated, "DANGER, Underwater Obstruction 500 Feet, Hazardous Undertow - Turbulent Water, Keep Off Weir and Riprap, Failure to Observe May Cause Entrapment/Drowning."  He testified that, in addition to his own personal experiences, he crafted this warning using ANSI Z-235.1 and NSC § 4100, safety principles detailing the most effective style and placement of warning language, and various principles pertaining to the psychological effect of warnings.

The defendants complain that Sissom failed to give an opinion as to the proper placement and feasibility of the warning signs; however, given the fact that warning signs had previously been posted on Big Creek, the undersigned fails to see how this omission undermines the reliability of Sissom's opinion as to the proper warnings.

The undersigned finds that Dr. Sissom's opinion regarding warnings is sufficiently reliable to be admissible, and **DENIES** the defendants' motion in limine as to

13

this testimony.

THUS DONE AND SIGNED at Monroe, Louisiana this 9th day of December, 2005.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE